# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-3236
_____

Justin Whaley; Rodney Redman; Ron Whaley; M. Sean Hatch; Michael Bahn;
Jodie Daniels; Tom Maddi

*Plaintiffs - Appellants*

v.

Jimmy Esebag; United Licensing Group, Inc.

*Defendants - Appellees*
_____

Appeal from United States District Court
for the Western District of Arkansas - Fayetteville
_____

Submitted: September 24, 2019
Filed: January 7, 2020
_____

Before COLLOTON, ERICKSON, and STRAS, Circuit Judges.
_____

ERICKSON, Circuit Judge.

Plaintiffs commenced this action in Arkansas federal court after a dispute involving an investment agreement with defendants, a California resident and his California-based business. The district court dismissed the case for lack of personal jurisdiction, and plaintiffs appealed. Because we find the defendants had sufficient contacts with Arkansas to establish personal jurisdiction, we reverse.

## I. Background

Plaintiffs Justin Whaley, Rodney Redman, Ron Whaley, M. Sean Hatch, Michael Bahn, and Jodie Daniels are residents of Arkansas; plaintiff Tom Maddi is a resident of Illinois. Each plaintiff is affiliated with and has been an employee of The Gyde Group, LLC, an Arkansas-based merchandising and marketing company with extensive experience marketing products to Walmart, Inc. Defendant Jimmy Esebag is a resident of California and the owner of California-based United Licensing Group, Inc. ("ULG").

On January 25, 2017, five of the seven plaintiffs met in California with Esebag and his assistant, Nicholai Allen, to discuss a potential marketing opportunity involving a new dietary supplement, "Dr. Boost." During the meeting and afterwards, Esebag stated an interest in working with the plaintiffs because of their experience working with Walmart, Inc., which has established its world headquarters in Bentonville, Arkansas. At the heart of the dispute between the parties is the plaintiffs' allegation that Esebag falsely represented that he would invest $20 million of his personal funds when Dr. Boost was ready for market, which he stated would occur by June 2017.

During the next few weeks, the plaintiffs participated from Arkansas in a number of followup conversations with Esebag via Skype, text, and email. These discussions primarily involved finalizing the terms of the parties' business relationship and developing a marketing strategy. Esebag also emailed a sales pitch to the plaintiffs in Arkansas. During these communications, the parties discussed using Arkansas as a possible test market for the Dr. Boost products, with Walmart, Inc. serving as a potential distribution partner.

A second in-person meeting took place in California on February 27, 2017. At this meeting the plaintiffs agreed to invest in the Dr. Boost venture by purchasing a

minority share of ULG. A third in-person meeting occurred in California on May 8, 2017, when Whaley, Chief Executive Officer, and Hatch, Chief Financial Officer and General Counsel, agreed on behalf of their investment company to pay $25 million for a 25% interest in ULG. The exact payment schedule was to be negotiated in the weeks that followed. Because the plaintiffs did not have $25 million on hand for the investment, they proposed a payment schedule that relied on future income from Dr. Boost to fund their investment obligations.

On May 10, 2017, Esebag emailed a first draft of the Memorandum of Understanding (MOU) to the plaintiffs. The parties continued to negotiate the payment schedule through a series of emails and telephone conversations spread over the next few days. Notwithstanding that no final payment schedule had been agreed upon, on May 16, 2017, the plaintiffs wired $2.5 million of good faith money to Esebag from their Arkansas bank account. During the next five and half weeks the parties continued to negotiate the terms of the payment schedule using both email and telephone. On June 2, 2017, Esebag shipped samples of Dr. Boost to plaintiffs in Arkansas.

The parties signed the MOU on June 23, 2017. Under its terms the MOU is governed by California law. The MOU acknowledged the $2.5 million payment, and it required the plaintiffs to make additional payments of $5.625 million every three months, beginning on December 1, 2017. The agreement also provided the plaintiffs with the option to split the first payment into two installments, with due dates on December 1, 2017, and January 31, 2018.

The plaintiffs assert that it was only after the MOU was signed that they became aware of false statements and misrepresentations made by Esebag during the negotiations. Specifically, they allege Esebag never intended to invest $20 million of his own funds, and he misled them about the timeline for product readiness.

On July 5, 2017, Esebag traveled to Bentonville, Arkansas, to meet with Whaley and Hatch. During this meeting, the plaintiffs allege that Esebag repeated his false statements and misrepresentations. At about the same time, the plaintiffs made known their concern that they would be unable to make the December payment required under the MOU because Dr. Boost was not yet generating income. Esebag made a second trip to Arkansas on August 10, 2017. The plaintiffs allege that during this meeting Esebag demanded payment of $1 million in October, as an advance on money due to be paid in December under the MOU. According to the plaintiffs, Esebag falsely stated that if the plaintiffs made the $1 million advance payment, the parties would meet to renegotiate the payment schedule at the end of the year.

On August 17, 2017, Esebag's attorney sent Hatch a draft Amendment to the MOU, which reflected the $1 million advance. When Hatch questioned why the draft was silent regarding the promised renegotiation, Esebag stated by email that "as discussed" the parties would meet in December or January regarding "any changes" to the payment schedule. In apparent reliance on Esebag's statements, the plaintiffs executed the MOU Amendment, and on October 13, 2017, they sent $1 million to Esebag from their Arkansas bank account.

On November 8, 2017, and without any further negotiations, Esebag's attorney sent instructions for the plaintiffs to wire a payment of $4.625 million due on December 1, 2017, consistent with the terms of the MOU. Plaintiffs pressed Esebag to schedule a meeting to renegotiate the payment schedule, but Esebag refused to meet claiming that the intended renegotiations were only for payments due after the December payment. The plaintiffs did not make additional payments, citing Esebag's false statements and misrepresentations.

Esebag filed a breach of contract action in the Superior Court of Los Angeles County, California, which was removed to the Central District of California where

it remains pending trial.[1] Plaintiffs filed the instant action in the Western District of Arkansas, alleging violations of securities fraud and sale of unregistered securities under federal and California law, and additional state law claims of fraud, unjust enrichment, and unfair competition. The district court granted Esebag's motion to dismiss for lack of personal jurisdiction, and the plaintiffs now timely appeal.

## II.    Discussion

We review questions of personal jurisdiction *de novo*. Burlington Indus., Inc. v. Maples Indus., Inc., 97 F.3d 1100, 1102 (8th Cir. 1996). The plaintiffs bear the burden of establishing a prima facie showing of jurisdiction, and we view the evidence in the light most favorable to the plaintiffs. Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG, 646 F.3d 589, 592 (8th Cir. 2011). Federal courts apply the long-arm statute of the forum state to determine the existence of personal jurisdiction over the parties. See FED. R. CIV. P. 4(k)(1)(A); Daimler AG v. Bauman, 571 U.S. 117, 125 (2014). Arkansas's long-arm statute permits personal jurisdiction to the maximum extent provided by the Due Process Clause. Ark. Code Ann. § 16-4-101; Anderson v. Dassault Aviation, 361 F.3d 449, 451 (8th Cir. 2004). Accordingly, to establish personal jurisdiction, a plaintiff must only show sufficient "minimum contacts" exist so that "traditional notions of fair play and substantial justice" are not offended. Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The conduct and connection with the forum state must be such that the defendant "could 'reasonably anticipate being haled into court there.'" Oriental Trading Co., Inc. v. Firetti, 236 F.3d 938, 943 (8th Cir. 2001) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).

---

[1] See Jimmy Esebag v. Rodney Redman, et al. 2:18-cv-08446 (C.D. Cal. October 1, 2018).

In analyzing specific jurisdiction, we consider whether the defendant has "purposely directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." Burger King Corp. v. Rudzewicz, 471 U.S. 469, 472 (1985) (internal citations omitted). See also Burlington, 97 F.3d at 1103. Because plaintiffs' claims sound in intentional tort, we evaluate specific jurisdiction using the "effects test" set forth in Calder v. Jones, 465 U.S. 783 (1984). In Calder, personal jurisdiction was established where the nonresident defendant committed a tort and the associated harm was felt primarily within the forum state. Id. at 787-89.

The Supreme Court has since narrowed its holding in Calder, highlighting "two related aspects" of the defendant's relationship with the forum that must be present to establish minimum contacts. Walden v. Fiore, 571 U.S. 277, 284 (2014). First, the relationship must arise out of contacts that the "defendant himself" created with the forum state. Id. (quoting Burger King, 471 U.S. at 475). Second, we look to the defendant's contacts and conduct with the forum state *itself*, not the defendant's contacts with persons who reside there. Id. at 285 ("[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State – either by the defendant in person or through an agent, goods, mail, or some other means – is certainly a relevant contact.").

While Esebag contends the Supreme Court's decision in Walden forecloses the possibility of a personal jurisdiction finding in this case, we find Walden distinguishable. 571 U.S. at 283-289. In Walden, a law enforcement officer detained a Nevada couple in a Georgia airport on suspicion of drug activity and seized $97,000 of their personal gambling funds. No charges were filed, and the money was returned to the couple several months later. The couple filed suit in Nevada, claiming Fourth Amendment violations. However, the officer never visited Nevada, he never communicated with the couple in Nevada, and he never sent anything to Nevada. The Supreme Court determined that defendant's only connection to Nevada was through

the plaintiffs, and so Nevada could not exercise personal jurisdiction. Unlike in Walden where the defendant's only connection to Nevada was through the plaintiffs, Esebag's relationship with Arkansas arises out of contacts that he created in Arkansas and deliberate and purposeful meetings in Arkansas during which the plaintiffs allege Esebag made false statements.

With these considerations announced by the Supreme Court in mind, we turn to the five-factor test that is used to assess minimum contacts, with the first three factors being of "primary importance": "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." Burlington, 97 F.3d at 1102. The third factor speaks to the particular question of specific jurisdiction. Id. The fourth and fifth factors "carry less weight and are not dispositive." Downing v. Goldman Phipps, PLLC, 764 F.3d 906, 912 (8th Cir. 2014) (quoting Johnson v. Woodcock, 444 F.3d 953, 956 (8th Cir. 2006)).

Turning to the facts before us, although the in-person meetings prior to the signing of the MOU took place in California, we also consider the two in-person meetings in Arkansas that took place after the MOU was signed. Downing, 764 F.3d at 912 (defendants' trips to forum state to secure payment and negotiate settlement were relevant to adjudicate nature of the contacts with forum). In addition to the in-person meetings, during the course of their negotiations and afterwards, Esebag sent numerous calls, emails, and text messages to the plaintiffs in Arkansas. He shipped samples of the Dr. Boost product and a sales pitch to Arkansas. Esebag made clear his desire to establish the relationship because of the plaintiffs' possible connections to Walmart, located in Bentonville, Arkansas. Given the plaintiffs ties to Walmart, it was evident that the prospect of doing business with Walmart was central to Esebag's interest in the relationship. Taken together, these facts suggest that Esebag's contacts with Arkansas were not "random, fortuitous, or attenuated," Burger

King, 471 U.S. at 475, but rather were central to an alleged scheme to "purposely avail[] [himself] of the privilege of conducting activities" in Arkansas. Fastpath, Inc. v. Arbela Tech., Corp., 760 F.3d 816, 821 (8th Cir. 2014). We find the first factor weighs in favor of finding personal jurisdiction.

In analyzing the third factor that pertains to specific jurisdiction, we consider the relationship between the cause of action – here, allegations of fraud – and Esebag's contacts with Arkansas. The plaintiffs allege that Esebag traveled to Arkansas on August 10, 2017, and demanded a $1 million advance payment for monies due on December 1, 2017. At this meeting in Arkansas, the plaintiffs allege that in exchange for the advance payment, the parties agreed to renegotiate the payment schedule. Weeks later, however, Esebag attempted to collect the plaintiffs' December payment without engaging in the promised renegotiation.

Viewing the facts in a light favorable to the plaintiffs, Esebag acted in furtherance of the alleged fraudulent scheme by traveling to Arkansas and, while there, making false statements to the plaintiffs. Esebag's actions were intended to and did in fact induce the plaintiffs to execute an amendment to the MOU and to forward a $1 million advance payment to Esebag. The effects of Esebag's conduct were felt by the plaintiffs in Arkansas. And, all of this occurred in the context of Esebag's apparent intention to establish a continuing business relationship by way of utilizing the plaintiffs' connections to Walmart and a hopeful distribution channel in Arkansas. Esebag's actions in and affecting Arkansas are central to the plaintiffs' allegations of fraud and misrepresentation, and they support a finding of specific jurisdiction.

We dispense with the second, fourth, and fifth factors as being neutral. The second factor requires us to consider the quantity of defendant's contacts with the forum. Esebag's contacts with the plaintiffs and Arkansas over the course of approximately one year were within a reasonable quantity as to be expected for the

negotiation and establishment of a business relationship, but the number of contacts does not sway the personal jurisdiction analysis.

The less important fourth and fifth factors offset each other.  The fourth factor concerns the interest of Arkansas in establishing a forum for its residents.  We believe that the allegations of intentional tort committed within Arkansas, described above, establish the type of jurisdictional connection that would create an obvious interest to assert personal jurisdiction.  However, the fifth factor involves convenience, and that consideration weighs in favor of Esebag.

Overall, the first and third factors support a finding of personal jurisdiction, while the second, third, and fourth factors are more neutral.  Our finding of personal jurisdiction applies to the claims asserted against both Esebag and ULG.  Esebag is the sole owner of ULG and he necessarily acted as the primary authorized agent on behalf of ULG in his dealings with the plaintiffs.  Esebag's actions, therefore, are sufficient to bind the company and assert personal jurisdiction over ULG without violating the traditional notions of fair play and substantial justice.  Int'l Shoe, 326 U.S. at 316-17.

## III.   Conclusion

For the foregoing reasons, the judgment of the district court dismissing the case for lack of jurisdiction is reversed.  The case is remanded for further proceedings consistent with this opinion.

_____